UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FIRST STATE DEPOSITORY COMPANY, LLC, ARGENT ASSET GROUP LLC, AND ROBERT LEROY HIGGINS,<br><br>Defendants. | Case No. 1:22-cv-1266-RGA<br><br>COMMODITY FUTURES TRADING COMMISSION'S OPPOSITION TO RECEIVER'S MOTION FOR AN ORDER ESTABLISHING A DISTRIBUTION AND CLAIMS ADJUDICATION PROCESS |

## I.  Introduction

Plaintiff Commodity Futures Trading Commission ("Commission") and the Receiver, Kelly M. Crawford, agree about much of the distribution plan proposed in the Receiver's Amended Motion for Order Establishing a Distribution and Claims Adjudication Process, D.I. 91 (the "Distribution Motion" or "Distr. Mot."). The Commission does not oppose the Receiver's proposed proof of claim process, the deadlines proposed in the Distribution Motion, or the Receiver's proposed claims hearing. The Commission also agrees that the discretion afforded to the Court in receivership proceedings is "extremely broad," and that a primary purpose of a receivership is "to promote orderly and efficient administration of the estate . . . for the benefit of creditors." Distr. Mot., D.I. 91 at 3-4.

However, the Commission and the Receiver disagree as to how the Court should exercise that discretion and administer the estate. In particular, the Commission writes in opposition to the Receiver's Plan insofar as it does not provide for a *pro rata* distribution of assets to

1

customers of Defendants First State Depository Company, LLC ("FSD") and Argent Asset Group LLC ("Argent").  In support of its opposition, the Commission states as follows:

## II.     *Pro Rata* Distribution is the Most Equitable and Fair Method of Distribution

"Equity receiverships are governed by equitable principles," and the "fundamental principal of a receivership distribution plan is that it should be equitable and fair, with similarly-situated investors treated alike.  *SEC v. Founding Partners Cap. Mgmt.*, No. 2:09-CV-229-FTM-29, 2014 WL 2993780, at *6 (M.D. Fla. July 3, 2014) (citations omitted); *see also SEC v. Wealth Mgmt. LLC*, 628 F.3d 323, 332 (7th Cir. 2010) (holding that "the primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable").  As the Third Circuit has explained, "all innocent victims should share equally in the recovered funds because equity demands equal treatment." *SEC v. Infinity Grp. Co.*, 226 F. App'x 217, 218 (3d Cir. 2007) (citing *Cunningham v. Brown*, 265 U.S. 1 (1924)).

Courts "routinely endorse[] the pro rata distribution of assets to investors as the most fair and equitable approach in fraud cases." *SEC v. Quan*, 870 F.3d 754, 762 (8th Cir. 2017) (collecting cases); *see also Infinity Grp.*, 226 F. App'x at 218 (noting that "the Courts of Appeals repeatedly have recognized" the appropriateness of *pro rata* distributions); *CFTC v. Equity Fin. Grp.*, No. CIV.04-1512 RBK AMD, 2005 WL 2143975, at *24 (D.N.J. Sept. 2, 2005), *report and recommendation adopted* 2005 WL 2864783 (D.N.J. Oct. 26, 2005) (noting that "the pro rata distribution method 'has been deemed especially appropriate for fraud victims'") (quoting *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 89 (2d Cir. 2002)).

Rather than proposing a *pro rata* distribution, the Receiver proposes to return in full the assets of customers who did not have assets missing when the Receiver took control of Defendants' premises ("Uncompromised FSD Customers," as defined by the Distribution Motion).  Customers who had some or all of their assets missing ("Compromised FSD

Customers") would have any assets that actually were at FSD returned to them, and they would then be compensated for their missing assets through a *pro rata* distribution of funds generated by the Receiver's liquidation of assets that belonged to Argent or Higgins or were not allocated to a specific customer, or any funds the Receiver can recover from other sources.

This proposal is akin to the concept of "tracing," where customers who can trace their funds to a specific account or location have those funds returned in full, while customers who cannot do so are deprioritized and only recover from any other existing funds. But "the Supreme Court has recognized that for purposes of equity, tracing principles can be suspended." *CFTC v. Eustace*, No. CIV.A. 05-2973, 2008 WL 471574, at *7 (E.D. Pa. Feb. 19, 2008) (citing *Cunningham*, 265 U.S. 1); *see also Infinity Grp.*, 226 F. App'x at 218 (citing *Cunningham*). In *Infinity Group*, the Third Circuit endorsed a *pro rata* distribution even though tracing of a "particular investors' assets" was possible, because there was no "equitable basis to distinguish between investors." 226 F. App'x at 218.

That is the case here. While there is undoubtedly a distinction between Compromised and Uncompromised FSD Customers—the former had assets taken, while the latter did not—that distinction is not one that provides an equitable basis for disparate treatment. There are a number of reasons why some customers may have had their assets misappropriated while others did not: Compromised FSD Customers may have been longtime FSD customers whose assets were exposed to misappropriation for a longer period of time; their assets may have been more marketable and thus easier to misappropriate and sell; or their assets may simply have been on a lower shelf in Defendants' warehouse or more readily accessible than other assets.

None of these reasons justify the result of the Receiver's proposal, which is that customers would essentially be made whole if they had the good fortune not to have their assets

taken, while those who were not so lucky would be forced to bear the brunt of Defendants' misconduct. Courts have held that relying on "mere fortuity" like this "is not . . . an equitable basis" for distribution, "particularly where doing so would harm other investors." *SEC v. Bivona*, No. 16-CV-01386-EMC, 2017 WL 4022485, at *7 (N.D. Cal. Sept. 13, 2017); *see also Equity Fin. Grp.*, 2005 WL 2143975, at *24 (holding that "it would be inequitable" to allow preferential recovery by claimants with traceable assets when the traceability is only "as a result of the fortuitous fact that the defrauders spent the money of other victims first") (quoting *Credit Bancorp*, 290 F.3d at 89). As the court explained in *Equity Financial Group*, "[t]o allow some claimants to recover to the exclusion of other victims would be to elevate the position of those claimants on the basis of the actions of the defrauders." *Equity Fin. Grp.*, 2005 WL 2143975, at *24 (cleaned up). Put simply, "equity demands equal treatment." *Infinity Grp.*, 226 F. App'x at 218; *see also Cunningham*, 265 U.S. at 13 (stating that "equality is equity"). And equal treatment in this case means that a customer's recovery should not depend on whether they were victimized by Defendants' misappropriation.

      The Receiver does not argue that there is some equitable basis on which to give preference to Uncompromised FSD Customers over Compromised FSD Customers. Instead, his argument is that because the assets at FSD "belong to the FSD customers . . . the Receiver cannot liquidate those assets" and "may only return the assets to the customer or to the customer's designee." D.I. 91 at 6. That may be true as a statement of the contractual obligations between FSD and its customers, obligations the Receiver may have inherited after his appointment. But the contractual relationship between FSD and its customers does not limit the Court's ability to ensure that assets and funds are distributed fairly and equitably in this receivership. To the contrary, multiple Circuit courts have held that in an equity receivership a "court is not required

to distribute the assets in accordance with the contractual rights of the parties." *Quan*, 870 F.3d at 762.  In *Broadbent v. Advantage Software, Inc*, the Tenth Circuit affirmed the district court's rejection of contract law arguments made by objecting investors, stating that "it was proper for the district court to summarily reject appellants'. . . various contract law arguments in favor of treating appellants like all other similarly situated claimants." *Broadbent v. Advantage Software, Inc.*, 415 F. App'x 73, 78 (10th Cir. 2011).  In *Liberte Cap. Grp., LLC v. Capwill*, the Sixth Circuit affirmed a ruling that the distribution of death benefits would not be based on the "contractual rights" or "ownership interest" of investors.  *Liberte Cap. Grp., LLC v. Capwill*, 148 F. App'x 426, 431 (6th Cir. 2005).  The Circuit held that while the investors "may well have valid legal claims, including breach of contract . . . a court sitting in equity has the discretionary authority to deny state law remedies as inimical to the receivership." *Id.* at 434.

In this case the contractual relationship between FSD and its customers should not trump the "wide equitable discretion" this Court has to ensure that Defendants' victims are treated equitably and fairly.  *Infinity Grp.*, 226 F. App'x at 219.  The Court should exercise its discretion to order a *pro rata* distribution of assets and funds to FSD customers, rather than permitting a recovery that depends on the "the actions of the defrauders," *Equity Fin. Grp.*, 2005 WL 2143975, at *24, or "mere fortuity," *Bivona*, 2017 WL 4022485, at *7.

In arguing for his contrary approach, the Receiver cites two main sources of authority: (1) a series of cases from bankruptcy courts; and (2) the Third Circuit's opinion in *SEC v. Black*, 163 F.3d 188 (3d Cir.1998).  *See* Distr. Mot., D.I. 91 at 5-6.  Neither authority mandates the result the Receiver proposes.

With respect to the bankruptcy cases, as one court in this Circuit noted, "[w]hen an equity receivership is involved, case law concerning equity receiverships is generally more applicable

5

than bankruptcy case law." *Eustace*, 2008 WL 471574, at *7; *see also SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 332 (5th Cir. 2001) (rejecting attempted reliance on bankruptcy case law because "we need not rely on bankruptcy law for this non-bankruptcy case"). This Court should follow *Eustace* and *Forex* and rely on the equity receivership cases the Commission cites, rather than the bankruptcy cases cited by the Receiver.

As to *Black*, that case is distinguishable on at least two grounds. *First*, *Black* dealt with a motion to lift an asset freeze, not a proposed distribution plan. The Third Circuit emphasized on multiple occasions that the order it was reviewing "did not determine claims, foreclose pursuit of taints, or in any way resolve disputes or final distributions among the parties." *Black*, 163 F.3d at 198; *see also id.* at 196 (same). The opinion is thus of less relevance to the distribution of assets than the cases the Commission cites.

*Second*, *Black* involved a receiver's authority over accounts held at third party financial institutions, not accounts held by the receivership entities themselves. As the Distribution Motion correctly notes, the *Black* decision depended on the court's conclusion that "the accounts were not truly within the control of the defendants in that action." D.I. 91 at 5. That is not the case here: all of the assets at issue are physically held in FSD's offices at 100 Todds Lane and were actually controlled by Defendants. Several other courts have distinguished *Black* on this ground. In *CFTC v. Battoo*, the court declined to apply *Black* even though, unlike the present case, it involved a motion to lift a freeze order. *CFTC v. Battoo*, 66 F. Supp. 3d 1095 (N.D. Ill. 2014). The court reasoned that *Black* depended on the fact that "[d]efendants did not have control over" the funds that were released, explaining that "implicit in the Third Circuit's holding 'is the idea that there exists a level of control over third party assets that *can* permit a court to freeze the funds.'" *Id.* at 1100 (emphasis added). In *Battoo*, the court held that an asset

6

freeze was justified because "regardless of who owned the Funds, the fact remains that [the defendant] could—and did—control them," and "exercised that control repeatedly in furtherance of his fraudulent scheme and to his own personal benefit." *Id.* at 1099-1100. The same can be said of Defendants' control over assets held in FSD accounts.

Similarly, in *Credit Bancorp*, the Second Circuit distinguished *Black* and other cases because in those cases "the assets had somehow been segregated in the manner of true trust accounts and/or had never been placed in the defrauder's control." 290 F.3d at 89-90. In *SEC v. Bivona*, the court cited *Black* and described it as applying in "contexts where the assets sought were segregated or handled in a manner where the traceable proceeds *were placed beyond the control of the defrauding entity*." 2017 WL 4022485, at *8 (emphasis added); *see also Forex Asset Mgmt.*, 242 F.3d at 331-32 (ruling that district court did not abuse its discretion in ordering *pro rata* distribution of funds in segregated account).

Unlike *Black*, and like *Battoo*, *Credit Bancorp*, and *Bivona*, in this case it is clear that the assets were in the "defrauder's control." In addition to the self-evident fact that the assets were stored in a facility controlled by Defendants, Defendants' control over customers' assets is evidenced by the misappropriation itself, by their refusal to return customer assets when requested, and their refusal to permit customers to even view or inspect their own assets, despite contractual language that ostensibly permitted customers to do so. *See, e.g.*, D.I. 7 at ¶¶ 9-16 (declaration from FSD customer describing Defendants' refusal to return assets or permit inspection of assets); D.I. 8 at ¶¶ 9-13 (same); D.I. 54 at ¶¶ 9-10 (declaration from FSD customer describing Defendants' refusal to wire money or return assets). Although there may be an argument that the customer assets were "segregated in the manner of true trust accounts," that segregation was subject to the whim of Defendants. In other words, customer assets were only

segregated for as long as Defendants allowed them to be. Defendants essentially treated FSD as their personal piggy bank, taking assets as needed and directing them to other uses. These facts, and Defendants' control over the assets at issue, distinguish this case from *Black*. Rather than following *Black*, the Court should follow the cases that distinguished *Black* for similar reasons, and exercise the broad discretion it has to direct the Receiver to make a *pro rata* distribution of assets and funds to FSD customers. This is the most fair and equitable result, which is the paramount consideration for courts in cases such as this one.

### III. The Commission Is Not Demanding the Liquidation of All Assets at FSD

The Commission writes briefly in response to a statement the Receiver made in his most recent status report, suggesting that the Commission contends that "all assets [held at FSD] should be liquidated and used to make a pro rata distribution to all FSD customers." D.I. 93 at 3. This is not true. The Commission does not contend that every single asset at FSD must be liquidated, with cash returned to customers on a *pro rata* basis. A number of the assets stored at FSD—perhaps a majority—are fungible. The Receiver may be able to distribute all or a substantial number of those assets on a *pro rata* basis rather than liquidating them. This possibility is illustrated by a hypothetical involving three FSD customers, each of whom believed they had 1,000 American Silver Eagles in their account, while in actuality two of the customers had 1,000 ASEs in their accounts, and the third had none. If the Court and/or Receiver determine that the appropriate *pro rata* distribution rate for FSD customers is 60%, the Receiver could distribute 600 ASEs to all three customers, and distribute the remaining 200 ASEs to another customer who is entitled to a *pro rata* distribution of ASEs. There of course may be circumstances in which liquidation is necessary or a distribution of assets is impossible, either because an asset cannot be divided for *pro rata* distribution, or because there are no assets at FSD that provide an adequate substitute for the asset the customer has lost. But there are some

circumstances in which asset substitution can be done, and indeed might be the preference of the customer.  In any event, the Commission wants to clarify that its proposal is not that the Receiver must liquidate every single asset stored at FSD.

*       *       *

For all of the foregoing reasons, the Commission respectfully requests that the Court deny the Receiver's Distribution Motion insofar as it does not provide for the *pro rata* distribution of assets and funds to Defendants' victims.

Date:  February 6, 2023

Respectfully Submitted,

By: _____

Brian A. Hunt
COMMODITY FUTURES
   TRADING COMMISSION
1155 21st Street, NW
Washington, D.C. 20581
Telephone: (202) 418-5000
(202) 418-5095 (Hunt)
bhunt@cftc.gov

## CERTIFICATE OF SERVICE

In accordance with Fed. R. Civ. P. 5(b)(2)(C), (E), and (F), I, the undersigned, hereby certify that on this 6th day of February, 2023, I:

- Caused the foregoing document to be served upon Defendant Robert L. Higgins by mailing it via overnight UPS to his last known address: 100 Applegate Drive, West Chester, PA 19382;

- Emailed the foregoing document to Mr. Higgins at his last known email address;

- Caused the foregoing document to be served upon Defendants FSD and Argent by delivering it via email to Kelly Crawford, the Receiver appointed by the Court to manage and oversee FSD and Argent's operations, which is a means of service that Mr. Crawford has consented to on behalf of FSD and Argent; and

- Filed the foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record, including the Receiver and his counsel.

*/s Brian A. Hunt*

Brian A. Hunt