## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

COMMODITY FUTURES TRADING
COMMISSION,

        Plaintiff,

    v.

FIRST STATE DEPOSITORY COMPANY,
LLC, ARGENT ASSET GROUP, LLC,
AND ROBERT LEROY HIGGINS,

        Defendants.

Civil Action No. 22-1266-RGA

<u>MEMORANDUM ORDER</u>

Before me is the Receiver's Amended Motion for an Order Establishing a Distribution

and Claims Adjudication Process. (D.I. 91). The motion is joined by Claimants Maria and

Veronica Carrozza. (D.I. 100). The motion is opposed by the Commodity Futures Trading

Commission (CFTC). (D.I. 95). The opposition is joined by Claimant Robert Bohli. (D.I. 96). I

have considered the briefing (D.I. 91, 95, 101) and joinders (D.I. 96, 100). For the reasons set

forth below, the Receiver's motion is GRANTED.

### I.   BACKGROUND

This motion arises from a lawsuit by the CFTC against First State Depository Company

("FSD"), Argent Asset Group ("Argent), and their owner, Robert Leroy Higgins. FSD provided

"depository storage services," storing "precious metals and valuables" for its customers. (D.I. 2 ¶

16). The complaint alleges that in the course of operating FSD and Argent, Mr. Higgins made

various false and misleading statements and misappropriated customer funds and metals. (*See*

*generally* D.I. 2). I granted the CFTC's motion to appoint Mr. Kelly Crawford ("the Receiver")

as an equity receiver to secure and recover the Defendants' assets. (D.I. 12, 57). All Defendants are in default. (D.I. 77).

The Receiver retained an accounting firm to inspect the Defendants' premises and review their records. (D.I. 91 at 2). While many assets were located and appropriately associated with customer accounts (D.I. 78 at 2), the missing assets are valued at $58.9 to $112.7 million. (D.I. 93 at 2). Many of the assets, missing and found, are "non-fungible, rare collectible items" that could not be immediately valued. (D.I. 78 at 3).

The Receiver's Motion proposes a plan to return all assets being held in custody and to compensate those customers of FSD who had assets missing by liquidating the Defendants' assets and any other excess or unidentified assets. (D.I. 91 at 3). Under the Receiver's plan, customers whose assets were not compromised will recover in full, less administrative expenses, while customers whose assets were compromised will receive whatever of their assets were found and a *pro rata* recovery. *Id.* The first group of uncompromised customers numbers about 1,083 customers (D.I. 82-1 at 10 of 72 tbl.1, hereinafter "Table 1") with assets valued at about $21-$31 million (D.I. 82-1 at 11 of 72 tbl.2, hereinafter "Table 2"). [1] The second group of compromised customers numbers about 1,013 customers (Table 1) with assets valued at about $87-$159 million (Table 2).[2] For the second group, there are about $26-$42 million of assets identifiable with a particular customer (Table 2, D.I. 82-1 at 11 of 72 tbl.3, hereinafter "Table

_____

[1] I reach 1,083 customers by summing 1,065 customers with no discrepancies and 18 customers with strictly excess inventory. For this and the following ranges of asset valuations, I round the lower bound down to the nearest whole million and upper bound up to the nearest whole million.
[2] I reach this range of valuations by summing the lower bounds of the found and missing assets and the upper bounds of the same reported in Table 2 and then rounding as described above in note 1.

3")[3] and commingled assets of about $8-$12 million available for distribution (Table 3),[4]

meaning that on average the second group is looking at a recovery of about 34-39%.[5] If recovery

were to be pro rata across all customers, on average all customers would be looking to recover

about 42-46%.(Table 2, 3).[6] The CFTC opposes the Receiver's Motion to the extent that it does

not provide for a *pro rata* distribution across all customers—uncompromised and compromised.

(D.I. 95 at 1-2).

## II.   DISCUSSION

The Receiver and the CFTC agree that "a *pro rata* distribution is the most fair and

equitable method of distribution in an equity receivership." (D.I. 101 at 1). I, too, agree. The only

disputed issue is whether those assets that "sit in segregated boxes in the vault of Defendant's

depository with the customer's account number" (the "Located Assets")[7] are part of the

receivership estate. *Id.* If they are part of the receivership estate, then they may be distributed on

a *pro rata* basis either through liquidation or, for fungible assets, directly. However, if they are

---

[3] Some compromised accounts are missing some assets but have extras of others. The tables do not report precisely how much is associated with compromised accounts but is not excess. This is a rough estimate inferred from the information provided.

[4] I am counting the following as commingled assets, as reported in Table 3: Excess Inventory, Unassigned/Argent, R. Higgins' Related Accounts. I rounded the ranges as described in note 1.

[5] I ballpark average recovery by calculating recovery using all low estimates (39%) and all high estimates (34%), rounding to the nearest percent. For any individual, recovery may be substantially less than average, particularly for individuals for whom no inventory has been located. For them, using the same method as above, I estimate the likely recovery as closer to 10-13%.

[6] I am calculating the overall pro rata average by simply using the total amount found versus the total amount that should have been found.

[7] What I am calling the "Located Assets" does not include assets of customers registered for FSD's "Silver Lease Program," who "granted the Defendants 'control' over their silver." (D.I. 101 at 2 n.1). The Receiver proposes to handle these customers' recovery separately, and the CFTC does not seem to dispute this.

not part of the receivership estate, they must be returned to the customers to whom they belong.

For the following reasons, I reluctantly conclude that they are not part of the receivership estate.

The Receiver argues that FSD's customers, and not the Defendants, hold title to the

Located Assets. He notes that the assets are not "merely . . . traceable" but were actually

"segregated in the manner of true trust accounts." *SEC v. Credit Bancorp*, 290 F.3d 80, 90 (2d

Cir. 2002). The customers "did not ever authorize the Defendants to exercise any control over

the assets." (D.I. 101 at 2). The Receiver likens these assets to those in safety deposit boxes at

banks. He notes, "A receivership of a bank or a storage facility does not entitle the receiver to

liquidate the assets in the safety deposit boxes or the storage units." *Id.*

The Receiver argues that because the customers continue to hold title to the Located

Assets, under *SEC v. Black*, the assets must be returned. (D.I. 101 at 4). In that case, the Third

Circuit affirmed the release and return of frozen funds from a receivership because "the

Defendants did not have 'control' . . . so as to permit [the court] to freeze the funds." *SEC v.*

*Black*, 163 F.3d 188, 196 (3d Cir. 1998). The Receiver also compares the present situation to a

bankruptcy proceeding, where "assets lawfully held in trust" would not be part of the bankruptcy

estate. (D.I. 101 at 6 (citing *City of Philadelphia v. Lieberman*, 112 F.2d 424, 426 (3d Cir.

1940))).

The CFTC takes the position that the Located Assets should be combined with the rest of

the assets and distributed *pro rata* to all of FSD's customers. The CFTC notes that the return of

the Located Assets would constitute "tracing," in which "customers who can trace their funds to

a specific account or location have those funds returned in full, while customers who cannot do

so are deprioritized." (D.I. 95 at 3). The CFTC then observes that "for purposes of equity, tracing

principles can be suspended." *CFTC v. Eustace*, 2008 WL 471574, at *7 (E.D. Pa. Feb. 19,

2008) (citing *Cunningham v. Brown*, 265 U.S. 1 (1924)). The CFTC argues that any ownership by FSD customers is merely a matter of "contractual obligation" (D.I. 95 at 4), and that, at least in some Circuits, a "court is not required to distributed the assets in accordance with the contractual rights of the parties." *SEC v. Quan*, 870 F.3d 754, 762 (8th Cir. 2017). The CFTC also argues that the FSD customers' assets were "actually controlled by Defendants" because they were held on Defendants' premises (D.I. 95 at 6), and "Defendants essentially treated FSD as their personal piggy bank." (*Id.* at 8).

The CFTC further argues that neither principles from bankruptcy nor *Black* apply to the present case. The CFTC cites *Eustace*, which notes, "When an equity receivership is involved, case law concerning equity receiverships is generally more applicable than bankruptcy case law." 2008 WL 471574, at \*7. Then, the CFTC distinguishes between the level of control here and in *Black*, because the assets released in *Black* were held by third party financial institutions. The CFTC argues that in *Black* and similar cases, "the traceable proceeds were placed beyond the control of the defrauding entity." (D.I. 95 at 7 (citing *SEC v. Bivona*, 2017 WL 4022485, at \*7 (N.D. Cal. Sept. 13, 2017))).

I first note that none of the cases cited by either the Receiver or the CFTC concern the return or redistribution of physical assets, some of which are non-fungible, as is the case here. Thus, none applies cleanly to the present case.

Overall, I agree with the Receiver that FSD customers still hold title to the Located Assets. Their claims are more than a matter of mere "contractual rights." Therefore, I think this is not simply an application of tracing. I defined the Receivership Estate—in an order drafted by the CFTC—as "all of the funds, properties, premises, accounts, income, now or hereafter due or owing to the Defendants, and other assets directly or indirectly owned beneficially or otherwise,

by the Defendants." (D.I. 57 ¶ 60). If FSD customers still hold title to the Located Assets, they seem to fall outside this definition.

While Defendants did exercise more control over assets stored with FSD than a bank would have with a customer's items placed in a safe deposit box, Defendants still exercised less control than in cases such as *Black*, where the defendant was authorized to manage client funds. *Black*, 163 F.3d at 192.

Although bankruptcy cases are not binding on my decision here, as equity proceedings, they are informative about how to treat assets held for others. The consensus in bankruptcy cases seems to be that such assets are not part of the bankruptcy estate. *See Torkelsen v. Maggio (In re Guild & Gallery Plus)*, 72 F.3d 1171, 1179-80 (3d Cir. 1996) (citing *United States v. Whiting Pools*, 462 U.S. 198 (1983)); *Lieberman*, 112 F.2d at 426. I think the same conclusion is sensible here.[8]

Therefore, the Receiver's Motion (D.I. 91) is GRANTED, and I will sign the Receiver's proposed order (D.I. 91, Ex. 2).

IT IS SO ORDERED.

Entered this 15 day of February, 2023

_____
United States District Judge

---

[8] I note that the Receiver's plan is simpler than the CFTC's and thus may be less expensive and more expeditious to implement. One consequence of the CFTC's proposal is that it seems likely almost all the assets would have to be liquidated, and that decisions would have to be made asset-by-asset. The Receiver's plan anticipates that a much greater percentage of the assets will not have to be liquidated. I mention this in a footnote because I see this as a collateral benefit of the Receiver's plan, but not a reason to adopt the Receiver's plan.