IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br>**Plaintiff,**<br><br>v.<br><br>FIRST STATE DEPOSITORY COMPANY, LLC, ARGENT ASSET GROUP, LLC, AND ROBERT LEROY HIGGINS,<br><br>**Defendants.** | § § § § § § § § § § § § § § | CASE NO.: 1:22-cv-01266-RGA |

## RECEIVER'S CLAIMS REPORT

Receiver Kelly M. Crawford ("Receiver") respectfully submits this Claims Report as required by the Order Granting the Receiver's Motion for Order Establishing a Distribution and Claims Adjudication Process [D.I. 103][1] (the "*Claims Process Order*").

### I.

### IDENTIFICATION OF CLAIMANTS

1. The Receiver identified potential claimants in the receivership by reviewing the records of the Defendants, primarily an inventory maintained by Defendant First State Depository Company, LLC ("FSD") of its customers and their holdings that were being held at the depository. In addition, the Receiver sought information from IRA custodians such as New Direction regarding the list of its customers and the holdings that were supposed to be at the depository.

---

[1] The deadline for the Receiver to file his Claims Report was extended until May 22, 2023 by an *Order Granting the Receiver's Motion to Extend Deadline for Filing the Claims Report, and to Increase the Surcharge for Certain Depositors* [D.I. 113](the "*Extension Order*").

{01908732;v3 }

Also, the Receiver retained the Baker Tilly accounting firm (the "Receiver's Accountants") to inspect all of the holdings present at the depository and compare them with the Defendants' records and the records of the IRA custodian. Indeed, the findings of the Receiver's Accountants' are set forth in the Accountants' Report filed with the Court on January 9, 2023 [D.I. 78-79], and the Accountants' Supplement to its Report filed with the Court on January 23, 2023 [D.I. 82](collectively, the "Accountants' Reports"). This examination by the Receiver's Accountants also helped identify potential claimants.

2. Potential claimants of Defendant Argent Asset Group, LLC ("Argent") were identified through a review of its records, and information obtained from the former officer of Argent, Steven Higgins. The Receiver has had a number of meetings and communications with Steven Higgins and deposed Steven Higgins on January 25, 2023.

3. Potential creditor claimants were identified through a review of the Defendants' records, and examination of the list of creditors and schedules filed in the pending bankruptcy of Defendant Robert Higgins.[2] Moreover, the Receiver directed the mail addressed to the Defendants FSD and Argent to the Receiver's office so the Receiver received invoices to such Defendants.

4. Finally, as explained below, the Receiver publicized notice of the receivership in the national publication *USA Today*, and the Receiver maintains a website www.fsdreceivership.com with information regarding the receivership.

---

[2] *In re: Robert L. Higgins,* Chapter 13, Bankruptcy Case No. 22-12021-MDC in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

{01908732;v3}

**RECEIVER'S CLAIM REPORT**                                                                                **PAGE 2**

II.

**DISTRIBUTION AND RECEIPT OF CLAIM FORMS**

5.     As required by the *Claims Process Order*[3], on or before February 25, 2023, the Receiver notified each potential claimant of the Claims Bar Date of April 1, 2023, and the Claimant's Right to file a claim. The notice included a copy of the Proof of Claim form approved by the Court and was either sent by first class mail to the last known address of the claimant, or by electronic mail.[4]

6.     As required by the *Claims Process Order*, on Friday, February 24, 2023, the Receiver published in *USA Today,* a national publication, notice of the right of a depositor or creditor to file a claim with the Receiver and the bar date of April 1, 2023 for filing claims.[5]

7.     Pursuant to the *Claims Process Order*, the Proof of Claim forms were required to be served on the Receiver no later than April 1, 2023 (the "Bar Date")[6].

8.     As the claims were received, they were scanned and each Claimant's name, and claim information was entered on spread sheets to facilitate further review. Each claim was assigned a claim number to protect the privacy of the person or entity filing the claim.

9.     Once the Bar Date passed, the claims, together with all supporting evidence, were reviewed by the Receiver and his team and compared to the Accountants' Reports to formulate the recommendations regarding the claims.

---

[3] *Claims Process Order*, Section 2.1.
[4] *Receiver's Certificate of Service and Publication of Proof of Claim and Notice of Right to File a Claim* filed on February 28, 2023 [D.I. 104].
[5] *Id.; see also Claims Process Order*, Section 2.2.
[6] *Claims Process Order,* Sections 1.4, 3.1, and 3.2.

## III.

## CLAIMS ANALYSIS AND RECOMMENDATIONS

The Receiver recommends approval of the claims, the classification of claims, and the amount of each claim, as set forth in the schedules attached hereto as **Exhibits A, D, F, G, H,** and **I,** and discussed more fully below:

### A. Uncompromised Claims

10. The Accountants found there were 1,080 FSD account holders classified as "Uncompromised FSD Customer". An account holder is classified as an "Uncompromised FSD Customer" if all of the inventory of the account holder was found present at the depository by the Receiver's Accountants.

11. The Receiver received 814 claims the Receiver classified as an "Uncompromised FSD Customer". A list of the Uncompromised FSD Customer claims (by claim number) is attached hereto as **Exhibit A**. The total value of the holdings of the Uncompromised FSD Customers who filed claims, as estimated by the Receiver's Accountants, is approximately $20,745,711. Those holdings are being returned to the Uncompromised FSD Customers.

12. To date, it appears that approximately 266 "uncompromised" account holders have not yet filed a claim in the receivership. The total value of the holdings of the Uncompromised FSD Customers who have not yet filed claims, as estimated by the Receiver's Accountants, is approximately $4,109,949. The Receiver's staff is doing its best to locate these account holders to insure they are aware of their need to file a claim. If the account holders fail to file a claim with the receivership, the Receiver will request the Court to order forfeiture of their holdings to the receivership estate.

13. Pursuant to the *Claims Process Order*, the Receiver charged each of the Uncompromised FSD Customer claimants a surcharge equal to 5.6 percent of the value of their holdings to offset the costs of security, insurance premiums, lease expenses, accounting expenses, utilities, and receivership costs. A true and correct copy of the Claim Confirmation and Request for Delivery Instructions sent by the Receiver to each of the Uncompromised FSD Customers is attached hereto as **Exhibit B**. To date, of the 814 claims that have been received, the surcharge is still owing and has not been paid by 200 of the claimants. The total of the unpaid surcharges from those Uncompromised FSD Customers who filed a claim to date is $255,555.

14. As set forth in Exhibit A, of the 814 Uncompromised FSD Customer claims, 30 claims were received by the Receiver *after* the Bar Date and are untimely. Pursuant to the *Extension Order*, the Court authorized the Receiver to charge those who filed a late claim a surcharge of 7.5 percent of the value of their holdings to offset the cost of the delay caused by the late filing. With the payment of the increased surcharge, the Receiver recommends that the late filed Uncompromised FSD Customer claims otherwise be allowed.

**B. Compromised Claims**

15. The Accountants' Report found there were 918 FSD account holders classified as "Compromised FSD Customer". An account holder is classified as an "Compromised FSD Customer" if some or all of the inventory of the account holder was not located at the depository by the Accountants.

16. The Receiver received 687 claims from FSD account holders that the Receiver classified as a "Compromised FSD Customer".

17. To date, it appears that approximately 231 "compromised" account holders have not yet filed a claim in the receivership. The Receiver's staff is doing its best to locate these

account holders to insure they are aware of their need to file a claim. If the account holders fail to file a claim with the receivership, the Receiver will request the Court to order forfeiture of their holdings to the receivership estate.

18. The Receiver provided each Compromised FSD Customer with a Claim Confirmation and Request for Delivery Instructions form that includes an itemized list of the items existing at the depository, if any, to be delivered to the customer, and the value of the missing items from the depository, as estimated by the Receiver's Accountants. This value serves as the dollar claim the customer has in the receivership. A true and correct copy of a sample of the Claim Confirmation and Request for Delivery Instructions sent by the Receiver to each of the Compromised FSD Customers is attached hereto as **Exhibit C**.

19. A schedule of the Compromised FSD Customer claims is attached hereto as **Exhibit D**. The total amount of the claims, representing the total value of the items missing from the depository, as calculated by the Receiver's Accountants, is $78,212,803.

20. As set forth on Exhibit D, of the 687 Compromised FSD Customer claims filed, 17 claims were received by the Receiver *after* the Bar Date and are untimely. Since there has not been any prejudice to the receivership estate caused by the delay in receipt of the claims to date, the Receiver recommends that the late filed Compromised FSD Customer claims be allowed.

C. **Compromised FSD Customer Silver Lease Program**

21. The Accountants' Report found there were 189 FSD account holders classified as "Compromised FSD Customers – Silver Lease Program". An account holder is classified as an "Compromised FSD Customer – Silver Lease Program" if the account holder participated in one of the silver lease programs offered by the Defendants, and some or all of the inventory of the account holder was not located at the depository by the Accountants.

22. The Receiver received 191 claims the Receiver classified as a "Compromised FSD Customer – Silver Lease Program".

23. The Receiver provided each Compromised FSD Customer – Silver Lease Program with a Claim Confirmation and Request for Delivery Instructions form that includes an itemized list of the items existing at the depository, if any, to be delivered to the customer, and the value of the missing items from the depository, as estimated by the Receiver's Accountants. This value serves as the dollar claim the customer has in the receivership. A true and correct copy of a sample of the Claim Confirmation and Request for Delivery Instructions sent by the Receiver to each of the Compromised FSD Customers – Silver Lease Program is attached hereto as **Exhibit E**.

24. A schedule of the Compromised FSD Customer – Silver Lease Program claims is attached hereto as **Exhibit F**. The total amount of the claims, representing the total value of the items missing from the depository, as calculated by the Receiver's Accountants, is $21,333,894.

25. As set forth on Exhibit F, of the 191 Compromised FSD Customer – Silver Lease Program claims, 3 claims were received by the Receiver *after* the Bar Date and are untimely. Since there has not been any prejudice to the receivership estate caused by the delay in receipt of the claims to date, the Receiver recommends that the late filed Compromised FSD Customer – Silver Lease Program claims be allowed.

**D. Purchase Money Claims**

26.     A claimant who provided monies to the Defendants to purchase metals or other assets on their behalf and the metals or other assets were not purchased, has a "purchase money claim" in the receivership.[7]

27.     The Receiver received 4 claims the Receiver classified as solely "purchase money claims." The Receiver calculated the claim amount by determining the money or other assets paid to the Defendants for the purchase of metals or other assets that were never purchased by the Defendants. A schedule of the Purchase Money Claims, and the dollar amount of each claim is attached hereto as **Exhibit G.**

   E.  **Creditor Claims**

28.     A claimant who was owed money by the Defendants as of the date of the receivership is classified as a creditor claim. A creditor can be either secured or unsecured.

29.     The Receiver received 6 claims the Receiver classified as a Creditor Claim. A schedule of the Creditor Claim and the dollar amount of each Creditor Claim is attached hereto as **Exhibit H.**

   F.  **Other Claims**

30.     The Receiver received 3 claims that were partially compromised claims or partially purchase money claims.

31.     The Receiver's recommendations regarding these claims are set forth on the schedule attached hereto as **Exhibit I.**

   G.  **Summary**

---

[7] *Claims Process Order*, Section 1.12.

{01908732;v3 }

In summary, the claim amounts recommended by the Receiver, as set forth in the attached Exhibits, are as follows:

| | |
|---|---|
| Compromised FSD Customers: | $78,212,803 |
| Compromised FSD Customers – Silver Lease Program: | $21,333,894 |
| Solely Purchase Money Claims: | $155,894 |
| Creditor Claims: | $1,239,075 |
| Mixed Claims: | $4,901,417 |
| **Total Amount of Claims:** | **$105,843,083** |

## IV.

## TREATMENT OF CLAIMS

32. This Claims Report contains the Receiver's recommendations only. The recommendations are subject to revision. Further, the claim amounts are also subject to additional proceedings in the claims approval process, including the Court's final determination of the amount and nature of each claimant's interest.

33. The Receiver will provide the Receiver's Claims Report to each claimant by May 29, 2023[8].

34. Pursuant to the *Extension Order*, any objections to the Receiver's recommendations are to be filed with the Receiver on or before June 16, 2023.[9]  No later than June 23, 2023, the

---

[8] *Extension Order* [D.I. 103]. In order to protect the privacy of the claimant, the Receiver assigned a claim number to the claimant and the public report filed with the court includes only the claim number, not the name of the claimant. If the Court or any party desires to see the names associated with the claims number, the Receiver will make that information available.
[9] *Extension Order* [D.I. 103].

{01908732;v3 }

Receiver is required to provide the Court with a copy of all timely **objections** and the Receiver's response to such objections.[10] If necessary, the Court may set a hearing to rule upon the objections.

35.     Fairness provides the overriding principle for evaluation of every issue arising in the supervision of an equitable receivership. *See SEC v. Black,* 163 F.3d 188, 199 (3rd Cir. 1998)("We note that where there is a receiver with equitable power in a proceeding before it, the District Court as wide discretion as to how to proceed"); *Commodity Futures Trading Comm'n v. Eustace,* No. CIV. A. 05-2973, 2008 WL 471574, at *7 (E.D. P. Feb. 19, 2008)(recognizing receiverships should utilize equitable principles); *U.S. v. Durham,* 86 F.3d 70, 73 (5th Cir. 1996) (district court supervising equitable receivership and evaluating methods of distribution to victims of Ponzi scheme is "court of conscience") (internal quotation omitted).

36.     With the foregoing principles in mind, the Receiver's *preliminary* recommendation regarding the treatment of claims is as follows:

37.     Although the Proof of Claim form requested claimants to identify if a claim was against Defendant Robert Higgins, Defendant First State Depository Company, LLC ("FSD"), or Defendant Argent Asset Group, LLC ("Argent"), the Receiver recommends that assets recovered from all of these defendants be used to make distributions to the approved claimants. After reviewing the claims filed and the documents of the Defendants, it is the Receiver's belief and contention that Higgins used both FSD and Argent interchangeably to defraud victims. For instance, a victim may have sent funds to Argent to purchase metals; the victim was told the metals were purchased, and the metals are now in the FSD depository. Such metals are not in the FSD depository, and there is no evidence the metals were ever purchased by Argent, other than holding detail reports issued by FSD to the victim. Also, in the same scenario, if a victim wanted to pick

---

[10] *Id.*

{01908732;v3 }

up a portion of their metals believed to be at the FSD depository, the Receiver believes Higgins would take metals from other FSD customers to give to the victim and maintain the illusion that the victim had all of his or her metals with FSD. Furthermore, there was commingling of assets between FSD and Argent that merits the two entities being treated as one and same for purposes of the claims process and making distributions of recovered assets to approved claimants.

38.     Those in the **Uncompromised FSD Customer** class are receiving a return of their property from the depository pursuant to the *Claims Process Order*[11], and have no dollar claim in the receivership.

39.     Those in the **Compromised FSD Customer** class are receiving a return of whatever remains of their property at the depository pursuant to the *Claims Process Order*[12], and have a dollar claim in the receivership as recommended by the Receiver and shown on Exhibit D.

40.     Those in the **Compromised FSD Customer – Silver Lease Program** class are receiving a return of whatever remains of their property at the depository pursuant to the *Claims Process Order*[13]. For the most part, however, nearly all of the holdings of those in the FSD Customer – Silver Lease Program are missing from the depository. Those in the Compromised FSD Customer – Silver Lease Program have a dollar claim in the receivership as recommended by the Receiver and shown on Exhibit F. The Receiver recommends subordination of the FSD Customer – Silver Lease Program claims to the claims of the Compromised FSD Customer. Unlike the Compromised FSD Customer, the FSD Customer – Silver Lease Program elected to take the risk of allowing the Defendants to exercise control over their holdings. Specifically, as part of the lease program, the participants allowed the Defendants to sell or otherwise dispose of

---

[11] *Claims Process Order*, Section 6.
[12] *Id.*
[13] *Id.*

{01908732;v3 }

their silver or other assets with the agreement that the silver or other assets would be replaced within thirty (30) days or other specific period of time. In exchange for allowing the Defendants to exercise control over their holdings, the participants who participated in the silver lease programs received compensation or were promised compensation. Those who granted control of their assets to the Defendants should be treated differently than those FSD customers who never granted the Defendants control of their assets, and instead were using FSD to simply store their assets. For that reason, in equity, the claims of the FSD Customer-Silver Lease Program should only be paid if the claims of the Compromised FSD Customer are first paid in full.

      41.     Those who have a **Purchase Money** claim have no property to be returned to them from the depository. Their claim should be treated the same as the Compromised FSD Customers. The dollar claim of those comprising the Compromised FSD Customers represents the value of the property that is missing from the receivership. Likewise, the holders of a Purchase Money claim have claims resulting from money missing from the receivership. The Receiver believes both are victims of theft. Assuming that is the case (and such assumption is based on the Receiver's belief as there has been no judicial determination as of this report), the only difference is that the Purchase Money claimant had their money stolen, and the Compromised FSD Customer had their metals or other assets stolen. The Purchase Money claim is based on the amount of money the Receiver believes was stolen, while the Compromised FSD Customer claim is based on the value of the metals or other assets the Receiver believes was stolen. Both types of claims are converted to dollars, and they should thus be treated the same for distributions.

      42.     Those who have a Creditor Claim should be subordinated to the claims of the Compromised FSD Customer, the Compromised FSD Customer – Silver Lease Claim, and the holders of a Purchase Money claim. The Court has discretion to prioritize claims based on

equitable concerns, and this discretion ordinarily includes subordinating the claims of creditors to the claims of victims. *See Commodity Futures Trading Comm'n v. RFF GP, LLC,* No. 4:13-CV-382, 2014 WL 491639, at *2 (E.D. Tex. Feb. 4, 2014), *report and recommendation adopted,* No. 4:13-CV-382, 2014 WL 994928 (E.D. Tex. Mar. 10, 2014)[14]. Accordingly, the Receiver recommends the subordination of approved unsecured creditor claims to the approved claims of those in other classes so that a creditor is not paid unless and until all approved claims of those in other classes are paid in full.

43. Finally, if there are monies available to distribute to holders of approved claims, the monies should be distributed on a *pro rata* basis to the holders of allowed claims of Compromised FSD Customers and Purchase Money claims. If those claims are paid in full, any monies remaining should be distributed on a *pro rata* basis to allowed claims of Compromised FSD Customers – Silver Lease Program. If those claims are paid in full, any monies remaining should be distributed on a *pro rata* basis to allowed Creditor Claims.

44. In administering the distribution of receivership assets, the Court is not bound by any particular method of distribution but has broad discretion. *Commodity Futures Trading Comm'n v. Eustace,* No. CIV. A. 05-2973, 2008 WL 471574, at *5 (E.D. P. Feb. 19, 2008)("[t]his discretion extends to the review of a receiver's proposed distribution plan.") citing *SEC v. Forex Asset Management LLC,* 242 F.3d 325 (5th Cir. 2001)(analyzing the district court's approval of the receiver's distribution plan under an abuse of discretion standard). In cases of fraud, a *pro rata* distribution of recovered assets to the victims of the fraud is appropriate. *SEC v. Infinity Group Co.,* 226 Fed. Appx 217, 218 (3rd Cir. 2007)(finding that the Court of Appeals repeatedly have

---

[14] The Receiver Kelly Crawford was also the receiver in this cited case who proposed the subordination of creditors that was accepted by the Court.

recognized that a *pro rata* distribution of a defrauder's assets to multiple victims of the fraud is appropriate and that the District Courts act within their discretion in approving such distributions.).

45. Based on the foregoing, distributions should be made to the holders of allowed claims in the class of Compromised FSD Customers and holders of Purchase Money claims on a *pro-rata* basis, calculated according to the amount the approved claim bears to the total amount of approved claims in those classes. If, for example, there are a total of $10 million of approved claims in those classes and there is $1 million to distribute, each holder of an approved claim in those classes would receive 10 percent of their total claim. Under this scenario, the holder of a claim of $25,000 in those classes would receive a distribution payment of $2,500 (10 percent of $25,000).

V.

**CONCLUSION**

This report is the Receiver's recommendation of what he believes to be the most fair and equitable means of handling the more than 1,600 claims received. When claimants receive a copy of this *Receiver's Claims Report* they will have an opportunity to determine whether they agree or disagree with the Receiver's recommendations. The Receiver will evaluate any objections received to his claims report and determine whether the Receiver needs to revise his recommendation for a particular claim. If the Receiver determines a revision is necessary the Receiver will inform the Court. If an objection cannot be resolved by the Receiver, it will be submitted to the Court for resolution.

Respectfully submitted on this 22nd day of May, 2023.

                ASHBY & GEDDES, P.A.

                */s/ Ricardo Palacio*
                Ricardo Palacio, Esq. (#3765)
                500 Delaware Avenue, 8th Floor
                P.O. Box 1150
                Wilmington, Delaware 19899-1150
                Tel: (302) 654-1888
                Fax: (302) 654-2067
                Email: rpalacio@ashbygeddes.com

                -and-

                SCHEEF & STONE, L.L.P.
                Peter C. Lewis, Esq.
                500 North Akard, Suite 2700
                Dallas, Texas 75201
                Telephone: (214) 706-4200
                Facsimile: (214) 706-4242
                Email: Peter.Lewis@solidcounsel.com

                *Counsel to Kelly Crawford, Receiver*