**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. 22-1266-RGA |
| FIRST STATE DEPOSITORY COMPANY, LLC, ARGENT ASSET GROUP, LLC, AND ROBERT LEROY HIGGINS, | |
| Defendants. | |

<u>MEMORANDUM ORDER</u>

On February 15, 2023, I entered an order in this case establishing a distribution and claims adjudication process. (D.I. 103).[1] I have received Receiver's Second Revised Claims Report (D.I. 154) and Report Regarding Objections to Receiver's Claims Report (D.I. 155), submitted in accordance with my order. Based on these reports, I have determined that a hearing on the claims and objections is not necessary. (*See* D.I. 103 ¶ 4.7). For the reasons stated below, the objections to the Receiver's Second Revised Claims Report are OVERRULED and the Receiver's Second Revised Claims Report is APPROVED.

**I.    BACKGROUND**

This case was filed by the Commodity Futures Trading Commission ("CFTC") against First State Depository Company ("FSD"), Argent Asset Group ("Argent), and their owner, Robert Leroy Higgins. FSD provided "depository storage services," storing "precious metals and valuables" for its customers. (D.I. 2 ¶ 16). The complaint alleges that in the course of operating

---

[1] Some of the deadlines in the original order were later modified. (*See* D.I. 113, 128).

FSD and Argent, Mr. Higgins made various false and misleading statements and misappropriated customer funds and metals. (*See generally* D.I. 2). I granted the CFTC's motion to appoint Mr. Kelly Crawford ("the Receiver") as an equity receiver to secure and recover the Defendants' assets. (D.I. 12, 57). All Defendants defaulted. (D.I. 77). On June 20, I entered a Consent Order of Permanent Injunction and Other Statutory and Equitable Relief against FSD and Argent. (D.I. 131). On June 30, I entered an Order for Default Judgment against Mr. Higgins. (D.I. 138).

Meanwhile, the Receiver retained an accounting firm to inspect the Defendants' premises and review their records. (D.I. 91 at 2). While many assets were located and appropriately associated with customer accounts (D.I. 78 at 2), a substantial portion of the assets Mr. Higgins purported to hold on behalf of the customers is missing. (D.I. 129 ¶ 1). Based on the Receiver's accounting, I approved a Distribution and Adjudication Process for claims against the receivership. (*See generally* D.I. 102).

As part of this claims and distribution process, the Receiver was to place customers and creditors with claims against Defendants into several categories. (D.I. 103 ¶ 4.1). "Uncompromised FSD Customers" had an account with FSD, and all the inventory of that account was found present at the depository. (D.I. 154 ¶ 3). "Compromised FSD Customers" had an account with FSD but had some or all of their inventory missing. (*Id.* ¶ 8). "Compromised FSD Customers – Silver Lease Program" ("Silver Lease Customers") had an account with FSD that was enrolled in FSD's silver lease programs, and some or all of their inventory was missing. (*Id.* ¶ 14). The silver lease programs allowed FSD to "sell or otherwise dispose of their silver or other assets with the agreement that the silver or other assets would be replaced within thirty (30) days or other specific period of time." (*Id.* ¶ 34). "Purchase Money Claimants" provided monies to Defendants—not necessarily FSD—so that Defendants would purchase metals or other assets

2

on their behalf, but such purchases were never made. (*Id.* ¶ 19). Creditors were owed money by Defendants as of the date of the receivership. (*Id.* ¶ 21). In addition, three claims were a mixture of the above types. (*Id.* ¶ 23).

Uncompromised Customers are having their assets returned, and the Receiver recommends that they not have a dollar claim in the Receivership. (D.I. 155 ¶ 31). All other categories of claimant will have a dollar claim. The Receiver has calculated the total value of claims by Compromised FSD Customers to be $50,588,772. Meanwhile, claims by Silver Lease Customers are valued at $19,735,792. Purchase money claimants have claims totaling $589,074. Finally, creditors and others with mixed claims have an additional $6,187,044 in claims against the receivership. The total value of the claims against the Receivership is $77,100,682. (D.I. 154 at 7).

The value of Receivership assets available for distribution, though still being determined,[2] will be far less than $77 million. As of the last accounting in January, it was estimated that there would be $8–12 million of Receivership assets to distribute among the various classes of claimants. (D.I. 102 at 3). One creditor has a claim secured by a judgment lien on Mr. Higgins's house. The Receiver proposes that this creditor will recover the value of the proceeds received for the sale of the house. (D.I. 154 ¶ 38). For all other claimants, the Receiver proposes a hierarchy of recovery based on the claimants' relationships with the Defendants. Broadly, the Receiver proposes,

> [I]f there are monies available to distribute to holders of approved claims, the monies should be distributed on a *pro rata* basis to the holders of allowed claims of Compromised FSD Customers and Purchase Money claims. If those claims are paid in full, any monies remaining should be distributed on a *pro rata* basis to allowed claims of Compromised FSD Customers – Silver Lease Program. If those

---

[2] First, the Receiver is still making efforts to search for missing assets. (D.I. 129 ¶ 7). Second, unclaimed assets will eventually be forfeited to the receivership. (D.I. 155 ¶¶ 5, 10).

claims are paid in full, monies remaining should be distributed on a pro rata basis to allowed Creditor Claims.

(D.I. 154 ¶ 39).

The Receiver has reported on the timely, unresolved objections to his proposed handling of the claims, which I now address. (D.I. 155 at 2).

## II.   DISCUSSION

### A. Silver Lease Claim Objections

I consider the objections by thirty-nine Silver Lease Program victims collectively. All thirty-nine of these objections take issue with the subordination of the claims of the Silver Lease Customers to the claims of Compromised Customers. (D.I. 155 at 4). Many of them argue that because Defendants misappropriated funds from both Silver Lease Customers and Compromised Customers, Silver Lease Customers deserve comparable treatment to Compromised Customers. (*See, e.g.,* D.I. 155-1 at APP0047, APP0048, APP0058).

The Receiver acknowledges that under the subordination he proposes, the Silver Lease Customers will likely not obtain any recovery from the Receivership. (D.I. 155 at 5). The Receiver argues, however, that it would be inequitable to the Compromised Customers not to subordinate the Silver Lease Customers. (*Id.* at 4-5). The Compromised Customers did not grant Defendants any control over their assets. The Silver Lease Customers did, in return for the promise of consideration. Thus, Silver Lease Customers knowingly incurred some risk in the hopes of some return. (*Id.* at 5). The Receiver has indicated that he will pursue a claim on behalf of the Silver Lease customers against any entities that received a commission from Defendants for bringing customers into Defendants' fraudulent scheme. (*Id.*).

I agree with the Receiver. I previously—reluctantly—concluded that there was legal significance to the level of control exercised by Defendants over victims' assets. (*See* D.I. 102 at

4

5-6). Likewise here, I think the fact that the Silver Lease Customers legally granted Defendants the ability to remove and use assets from their accounts means that their claims are of a different nature and should be subordinated. (D.I. 154 ¶ 34).

Some of these customers dealt with FSD only through a third party, West Hills Capital, and represent that they were not fully aware of the relationship between West Hills and FSD. (*See, e.g.,* D.I. 155-1 at APP052). Unfortunately, this does not change the nature of their claims against FSD. The Receiver's plan to pursue claims against West Hills Capital and other third parties is the appropriate way to handle these customers' concerns. I also note that the Compromised Customers, who dealt directly with Defendants, will not be able to recover through such a channel.

I agree with the Receiver's arguments. That so few assets are available for redistribution is regrettable, but it does not change the legal principles on which the Receivership and claim scheme are based. Therefore, the thirty-nine objections by Silver Lease Claimants are OVERRULED.

### B. Objection by Claimant 1049

Claimant 1049 objects to the Receiver's valuation of his claim. The Receiver valued all claims, including Claimant 1049's, based on commodity prices on October 4, 2022. However, Claimant 1049 objects that the value of his deposit based on October 4 prices is lower than his original purchase price of the assets. The Receiver argues that determining each victim's purchase price would be inequitable and impractical, and that all the assets must be valued at the same particular point in time. (D.I. 155 at 7).

I agree with the Receiver's reasoning. Commodity prices fluctuate over time. It is fairest to all claimants to determine the relative sizes of the claims by using the same date for everyone.

Further, as the date on which the Receiver took control of the assets, October 4 is as fair and sensible a date as any. Therefore, the objection by Claimant 1049 is OVERRULED.

### C. Objections by Claimants 1192 and 1193

Claims 1192 and 1193 are held by the same individual ("the Claimant," for this subsection). The Claimant has two objections. First, the Claimant notes that the accounts associated with Claim 1192 were compromised, while the account associated with Claim 1193 was not. (D.I. 155-1 at APP0106). The Claimant objects to having to pay the surcharge on the uncompromised claim, because her other claim was categorized as compromised. Second, the Claimant notes that some unassigned assets match assets missing from her account. The Claimant would like those assets assigned to her account. (*Id.*).

As to the first objection, the Receiver argues that he legally cannot treat the Claimant's two accounts together, because her compromised accounts were an IRA and an HSA, while her uncompromised account was a standard individual account held by her and her spouse. The Receiver notes that treating the accounts together would create tax consequences for the beneficiary of the IRA and HSA. (D.I. 155 at 7).

As to the second objection, the Receiver notes that the unclaimed assets that match the Claimant's assets were tagged as being associated with another account. However, the owner of that account has not filed a claim, and, if that remains true, the Receiver is willing to reassign the assets to the Claimant. (*Id.* at 8). If the assets are not claimed, it would seem reasonably probable, based on their particular description, that they belong to the Claimant.

I agree with the Receiver's reasoning on both objections. I note with regard to the first objection that it is Claims, and not Claimants, that are placed in categories. I also note that the

second objection may well be resolved down the line. Therefore, the objections by Claimants 1192 and 1193 are OVERRULED.

### D.  Objection by Claimant 1711

Claimant 1711 has a purchase money claim against Defendant Argent. Claimant 1711 objects to the purchase money claim being grouped with the claims by Compromised FSD Customers. Claimant 1711 argues that under Delaware law, Defendant Argent was a distinct company. The Receiver argues that the Consent Order against Defendants makes the factual finding that "FSD and Argent Operated as a Common Enterprise." (D.I. 155 at 9 (citing D.I. 131 ¶¶ 56-58)). The Receiver argues under Third Circuit law that Argent and FSD meet the test for a common enterprise. (*Id.* at 10).

I agree with the Receiver's reasoning. The factual record of this case makes clear that FSD and Argent never operated as separate entities. Therefore, the objection by Claimant 1711 is OVERRULED.

### E.  Objection by Claimant 1739

Claimant 1739 objects to the magnitude of the surcharge he is required to pay as an Uncompromised FSD Customer. (D.I. 155-1 at APP0277). The Receiver argues that it would be inequitable not to place some of the expenses of the Receivership on uncompromised customers. To do so would result in those customers who have been compromised bearing costs in addition to having lost assets. (D.I. 155 at 12).

I agree with the Receiver's reasoning. The costs of locating, securing, accounting for, and distributing assets have been for the benefit of Uncompromised as well as Compromised Customers. Therefore, the objection by Claimant 1739 is OVERRULED.

### F.  Objection by Creditor CR05

Creditor CR05 objects to the classification of its claim as unsecured and also contends that its claim is accruing interest. The Receiver has reclassified Creditor CR05's claim as secured but notes that other courts have held that claims in the hands of a receiver are not allowed to accrue interest. (D.I. 155 at 13). The Receiver also notes that, since the claim was secured with a judgment lien against Mr. Higgins's house, the claim amount will be capped at the proceeds from the sale of that house.

I agree with the Receiver's reasoning. Therefore, the objection by Creditor CR05 is OVERRULED.

### G.  Objection by Creditor CR06

Creditor CR06 objects to the subordination of unsecured creditor claims to the payment of all other claims against the receivership. Specifically, Creditor CR06 asks for the "first in time first in right" prioritization of Delaware mortgage lien law. (D.I. 155-1 at APP0282). The Receiver responds that "first in time, first in right" applies only to secured creditors, which CR06 is not. (D.I. 155 at 14). The Receiver also notes that Creditor CR06's claim is against a now-dissolved entity for wrongful actions taken by Mr. Higgins before the relevant period of the complaint in this case. (*Id.* at 14). The Receiver finally argues that it is common for unsecured creditor claims to be subordinated to claims by depositors. (*Id.* at 14-15).

I agree with the Receiver's reasoning and think that he has presented ample arguments for the subordination of unsecured creditor claims in general and Creditor CR06's claim in particular. Therefore, the objection by Creditor CR05 is OVERRULED.

## III.    CONCLUSION

For the foregoing reasons, all objections to the Receiver's Second Revised Claims Report are OVERRULED and the Receiver's Second Revised Claims Report is APPROVED.

IT IS SO ORDERED.

Entered this 4th day of August, 2023

United States District Judge